**DOUGLAS et al. v. CITY OF JEANNETTE, PA., et al.**

**No. 7793.**

Circuit Court of Appeals, Third Circuit.

Argued Jan. 7, 1942.

Reargued June 15, 1942.

Decided Aug. 31, 1942.

Fred B. Trescher, of Greensburg, Pa. (Kunkle, Walthour & Trescher, of Greensburg, Pa., on the brief), for appellants.

Hayden C. Covington, of Brooklyn, N. Y. (Joseph F. Rutherford, of Brooklyn, N. Y., on the brief), for appellees.

Before BIGGS, MARIS, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

The plaintiffs,[1] members of a sect known as Jehovah's Witnesses, brought suit in the district court for themselves and "for all Jehovah's Witnesses throughout the entire Commonwealth of Pennsylvania and adjoining states" to enjoin the defendant city of Jeannette and its Mayor from enforcing against them and other members of the Jehovah's Witnesses a certain ordinance of that city, which is a municipal corporation organized under the laws of Pennsylvania. After hearing, the court below concluded that the ordinance, as applied by the municipality's officers to the activities of the Jehovah's Witnesses, worked a deprivation of their freedom of worship, of speech and of press in violation of the Fourteenth Amendment of the Constitution of the United States. Accordingly, the court entered the decree from which the defendants took the instant appeal.

The appeal raises two questions, (1) whether the District Court had jurisdiction of the cause, and (2) whether the ordinance is unconstitutional as applied to the activities of the plaintiffs and others of the Jehovah's Witnesses.

In part here material, the ordinance[2] provides that all persons canvassing for or soliciting orders, within the city of

---

[1] Of the nine plaintiffs, seven are citizens of Pennsylvania, one of Ohio and one of West Virginia.

[2] The ordinance in full is as follows: "Ordinance No. 60 of the City of Jeannette:

"That all persons canvassing for or soliciting within said Borough [now City] of Jeannette orders for goods, paintings, pictures, wares or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the Burgess a license to transact said business and shall pay to the Treasurer of said Borough therefor the following sums according to the time for which said license shall be granted.

"For one day $1.50, for 1 week, seven $7.00 Dollars, for two weeks twelve $12.00 Dollars, for three weeks twenty $20.00 Dollars, provided that the provisions of this ordinance shall not apply to persons selling by sample to manufacturers

Jeannette, for goods, wares and merchandise of any kind shall procure from the Mayor of that city a license, paying therefor to the city's Treasurer a fee of $1.50 a day with relative reductions in the per diem rates for longer term licenses.

The Jehovah's Witnesses are an unincorporated body of persons who profess themselves to be acting in obedience to the commands of Almighty God as revealed by the Bible. Each of the members of the group asserts that he is an ordained minister and that he is required by his faith to give witness to the name, honor and majesty of Almighty God by preaching the gospel, as understood by them, upon the streets of communities, and by distributing certain literature, for a specified contribution, to people upon the streets and in their homes. The literature, which is published or issued by the Watchtower Bible and Tract Society, Inc., a New York corporation, is in the form of books, pamphlets and periodicals, and is intended to inform and persuade the persons receiving it of the merit of the religious beliefs of Jehovah's Witnesses, who personally and in the literature strongly attack the religious practices of organized churches existing today.

The plaintiffs, along with other members of the Jehovah's Witnesses, went to the city of Jeannette, and upon going from house to house, played on portable phonographs records of matter which they desired to impart to their auditors, to whom they then offered the books and pamphlets of the sect in exchange for a contribution, so-called, of twenty-five cents for a book and five cents for a pamphlet or two. There is evidence that at times one or more of the publications were given free if the particular auditor appeared to be interested but was without the means to make the requested contribution. Such gratuitous distribution was necessarily limited as the solicitors are required to pay the Watchtower Bible and Tract Society for the literature which they distribute. The publications were also offered on like conditions to people upon the streets of the city.

In March, 1939, the city officials of Jeannette notified the Jehovah's Witnesses that it was necessary for them to procure licenses, as provided by the ordinance, if they desired to solicit from house to house, and that, failing so to comply, they would be arrested for violating the ordinance. On April 2, 1939, a letter signed by some fifty members of the Witnesses, including most of the plaintiffs, was delivered to the police and Mayor of Jeannette informing them that they refused and would continue to refuse to obtain licenses on the ground that they were not peddlers but ministers of Jehovah God doing their work in obedience to His explicit command and that for them to seek a permit to do what they were so commanded would be an insult to the Creator as His law is supreme and above all human law.

Having thus refused to procure licenses, a number of the Jehovah's Witnesses renewed their door to door canvassing and soliciting in the city of Jeannette on April 2, 1939. On that occasion (a Sunday) more than one hundred of them came into the city and proceeded to canvass and solicit from house to house throughout the day. During that visitation the time of the city's police and firemen was preempted in receiving and investigating numerous complaints from citizens because of the activities of the Witnesses, twenty-one of whom were arrested at that time for violating the ordinance. Eighteen of those arrested were held for a hearing before the Mayor's court, where they were convicted, of the violations charged. Appeals to the Quarter Sessions Court of the local jurisdiction (Westmoreland County) from the convictions in the Mayor's court were dismissed because of the appellants' failure to attach transcripts of the records of

---

or licensed merchants or dealers doing business in said Borough of Jeannette.

"That all persons huckstering, peddling or selling fruits, goods or other merchandise upon the streets of said Borough by outcry or solicitation of the people upon the streets or thoroughfares of said Borough shall be required to procure from the Burgess a license to transact said business and shall pay to the Treasurer of said Borough therefor the sum of ten ($10.00) Dollars per day. Any person or persons failing to obtain a license as required by this ordinance shall, upon conviction before the Burgess or Justice of the Peace of said Borough forfeit and pay a fine not exceeding one hundred $100.00 Dollars, nor less than the amount required for the license for such person or persons together with costs of suit, and in default of payment thereof, the defendant or defendants may be sentenced and committed to the Borough lock-up for a period not exceeding five (5) days or to the County Jail for a period not exceeding thirty (30) days."

conviction in the Mayor's court and, also, because of a decision by the Pennsylvania Superior Court (City of Pittsburgh v. Ruffner, 134 Pa.Super. 192, 4 A.2d 224) upholding the validity and like enforcement of a somewhat similar ordinance. A joint appeal to the Pennsylvania Superior Court from the judgments of the Quarter Sessions Court was also dismissed because the record presented no basis for holding that there had been an abuse of discretion on the part of the Quarter Sessions Court.[3] An appeal to the Supreme Court of Pennsylvania from the judgment of the Superior Court was likewise refused.[4] The defendants then petitioned the Supreme Court of the United States for certiorari, which was denied, as was also their petition for rehearing.[5]

Since April 1939 the Jehovah's Witnesses have continued their house to house canvass in the city of Jeannette, offering their literature and soliciting contributions. At no time have they applied for or procured licenses as required by the ordinance, and arrests and convictions for violations of the ordinance continued. Exclusive of the twenty-one arrests made on April 2, 1939, more than thirty arrests were made from then until February 1940, when the latest arrests were made. Appeals from convictions on the later arrests are still pending in the Quarter Sessions Court of Westmoreland County, Pennsylvania. It was in that situation that the suit for an injunction was instituted in the court below.

■ We shall consider first the question whether the district court had jurisdiction of the cause of action. The complaint alleges that jurisdiction exists under and by virtue of the Civil Rights Act of 1871, now Section 1979 Revised Statutes, 8 U.S.C.A. § 43,[6] which confers a personal right of action at law or in equity for the redress of "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws", and Section 24(14) of the Judicial Code, 28 U.S.C.A. § 41(14),[7] which confers upon the district courts jurisdiction of suits brought under the authority of Section 1979 Revised Statutes.[8] The rights of which the plaintiffs allege they have been deprived by the defendants under color of the ordinance in question are their rights to freedom of speech, freedom of the press, freedom of assembly and freedom of religious worship. In paragraph 17 of the complaint[9] it is expressly averred that the ordinance has been applied by the defendants against the plaintiffs so as to deprive them of these rights "contrary to the Federal Constitution, Fourteenth Amendment, Section 1." Since these rights are not privileges or immunities of national citizen-

---

[3] Commonwealth v. Stewart, 137 Pa. Super. 445, 448, 9 A.2d 179.

[4] See 137 Pa.Super. XXXIII under "Allocaturs Refused by the Supreme Court of Pennsylvania".

[5] Stewart v. Pennsylvania, 309 U.S. 674, 60 S.Ct. 714, 84 L.Ed. 1019, rehearing denied 309 U.S. 699, 60 S.Ct. 886, 84 L.Ed. 1037.

[6] Section 1979 Revised Statutes is as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[7] Section 24(14) of the Judicial Code is as follows:
"The district courts shall have original jurisdiction as follows:
\* \* \* \* \* \*
"Fourteenth. Of all suits at law or in equity authorized by law to be brought by any person to redress the depriva-

tion, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

[8] Hague v. Committee for Ind. Org., 307 U.S. 496, 508, 529, 530, 59 S.Ct. 954, 83 L.Ed. 1423.

[9] Paragraph 17 of the complaint is as follows:
"That the above described ordinance of said City of Jeannette is unconstitutional and void as construed and applied by defendants against plaintiffs because as so construed and applied each of the provisions of said ordinance has been used and will be used unlawfully to deny and deprive plaintiffs and others of Jehovah's witnesses of their 'civil rights' of freedom of speech, of press and of assembly, and freedom to worship Almighty God according to dictates of their consciences, all contrary to the Federal Constitution, Fourteenth Amendment, Section 1."

ship[10] and since a denial of the equal protection of the laws is not involved, the reference must necessarily be to the provision of the Fourteenth Amendment that no state shall "deprive any person of * * * liberty * * * without due process of law."

 Freedom of worship, freedom of speech, freedom of the press, and the right of assembly are not the subject of direct constitutional grant. They are, however, constitutionally recognized and confirmed as attributes of liberty incident to all persons under the Constitution and laws of the United States regardless of their citizenship; and, as such, they are secured by the First Amendment against abridgment by the Congress, and by the Fourteenth Amendment against deprivation by a state without due process of law.[11] It is now settled that they are rights "secured" by the Constitution within the meaning of Section 1979 Revised Statutes and Section 24(14) of the Judicial Code.[12] It follows that if the complaint sufficiently alleges deprivation of these rights without due process of law the jurisdiction of the district court must be sustained, since jurisdiction to hear a suitor's complaint depends upon what he states his complaint to be and not upon whether at the hearing he is able to establish its merit.[13] For were we to hold that jurisdiction exists only if the proven facts

justify the conclusion that there has been a deprivation of liberty without due process of law it would necessarily follow that in every such case the court would have to hear and decide the merits of the controversy before deciding whether it had power to hear and decide the merits. This would be a manifest absurdity.

 The complaint, as we have seen, merely alleges in effect that the plaintiffs have been deprived of their liberty without due process of law. The due process of law which is claimed to have been absent is in no way spelled out. This, it is urged, renders the complaint insufficient to establish jurisdiction. It is said that the facts showing a want of due process should have been alleged. But we think they need not, indeed cannot, be set out where substantive rather than procedural rights are concerned. The impossibility of particularizing the absence of due process of law in pleading a violation of the due process clause as the basis for the jurisdiction of the district court is due primarily to the undefined and ever changing character of the concept involved. An examination of the cases discloses that the Supreme Court has consistently refused to attempt a comprehensive definition of what is meant by due process of law.[14] Such definitions as it has formulated have been so

[10] See Justice Stone's discussion of this subject in Hague v. Committee for Ind. Org., 1938, 307 U.S. 496, 520–522, 59 S.Ct. 954, 83 L.Ed. 1423.

[11] Chaplinsky v. State of New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. ——; Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L. Ed. 1113, 128 A.L.R. 1352; Hague v. Committee for Ind. Org., 307 U.S. 496, 519, 59 S.Ct. 954, 83 L.Ed. 1423; Lovell v. Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949; De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278; Grosjean v. American Press Co., 297 U.S. 233, 243, 244, 56 S.Ct. 444, 80 L.Ed. 660; Near v. Minnesota, 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357; Stromberg v. California, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A. L.R. 1484; Gitlow v. New York, 268 U. S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138.

[12] Hague v. Committee for Ind. Org., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423.

[13] Mosher v. Phoenix, 1932, 287 U.S. 29, 53 S.Ct. 67, 77 L.Ed. 148. In Minersville District v. Gobitis, 1940, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, the plaintiffs sought to enjoin the defendants from enforcing a school board regulation which required pupils to salute the flag as a condition to attendance at the public schools. The district court concluded that it had jurisdiction and that the plaintiffs had been deprived of their liberty and property without due process of law. It issued an injunction and was affirmed by the Circuit Court of Appeals. The Supreme Court reversed, concluding that the plaintiffs had not been deprived of their liberty and property without due process because it was the proper exercise of the state's governmental function to adopt appropriate means to evoke national unity among school children. This was a ruling that the plaintiffs had not made out a cause of action. Although exactly the same facts were relied upon for jurisdiction which the Supreme Court concluded were insufficient to state a cause of action it did not remand to the district court with directions to dismiss the bill in equity for want of jurisdiction or indicate in any other way that jurisdiction was lacking.

[14] Davidson v. New Orleans, 1877, 96 U.S. 97, 101, 24 L.Ed. 616; Orient Insurance Company v. Daggs, 1898, 172

restricted to the facts of the particular cases before it as to render them inapplicable as statements of general principles. Then also for many years after the inclusion of the due process clause in the Fourteenth Amendment the cases were concerned with due process of law solely in its procedural aspect. Indeed this was so generally the case that it was at one time thought that the due process clause applied only to procedural rights.[15] Gradually, however, the scope of the phrase was broadened by judicial construction and substantive rights were recognized to be embraced within its protection.[16] Due process of law thus came to be recognized as representing the limits which the Constitution places upon that exercise by the state of its sovereign power which infringes the traditional and constitutionally secured rights and liberties of the individual.

Considered as a touchstone by which the inevitable conflicts between the broad sweep of the state's sovereign power and the cherished rights and liberties of the citizen are to be resolved the concept of due process of law could no longer be restricted to the definite issues of fact which are involved in purely procedural questions but inevitably entered into the realms of political, social and economic theory and became purely a matter of judgment on the part of the ultimate tribunal.[17] The presence or absence of due process of law thus

U.S. 557, 563, 19 S.Ct. 281, 43 L.Ed. 552; Ballard v. Hunter, 1906, 204 U. S. 241, 255, 27 S.Ct. 261, 51 L.Ed. 461; Twining v. New Jersey, 1908, 211 U.S. 78, 99, 100, 29 S.Ct. 14, 53 L.Ed. 97; Betts v. Brady, 1942, 62 S.Ct. 1252, 86 L.Ed. ——; see, also, Kales—"Due Process" The Inarticulate Major Premise (1917) 26 Yale L.J. 519.

[15] Reeder, The Due Process Clauses and "The Substance of Individual Rights" (1910) 49 U. of Pa.L.Rev. 191.

[16] In Chicago, Burlington, etc., R. Co. v. Chicago, 1896, 166 U.S. 226, 234, 235, 17 S.Ct. 581, 584, 41 L.Ed. 979, Justice Harlan said: "But a state may not, by any of its agencies, disregard the prohibitions of the fourteenth amendment. Its judicial authorities may keep within the letter of the statute prescribing forms of procedure in the courts, and give the parties interested the fullest opportunity to be heard, and yet it might be that its final action would be inconsistent with that amendment."

In Buck v. Bell, 1927, 274 U.S. 200, 207, 47 S.Ct. 584, 585, 71 L.Ed. 1000, Justice Holmes said: "There can be no doubt that so far as procedure is concerned the rights of the patient are most carefully considered, and as every step in this case was taken in scrupulous compliance with the statute and after months of observation, there is no doubt that in that respect the plaintiff in error has had due process at law. The attack is not upon the procedure but upon the substantive law."

In Whitney v. California, 1927, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L. Ed. 1095, Justice Brandeis said: "Despite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure."

[17] In argument in the Supreme Court in Adkins v. Children's Hospital, 261 U. S. 525, 530, 531, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, counsel for the appellants, now a justice of that court, ably characterized the essential nature of due process of law as follows: "This Court has consistently recognized the futility of defining 'due process'. The 'due process' clauses embody a standard of fair dealing to be applied to the myriad variety of facts that are involved in modern legislation. That is why this Court has refused to draw lines in advance. The impact of facts must establish the line in each case. The application of 'due process' clauses is, in the last analysis, a process of judgment by this Court. In the application of the varying facts to the test of fair dealing the ultimate question in this Court is, does legislation, or its actual operation, 'shock the sense of fairness the Fourteenth Amendment was intended to satisfy in respect to state legislation'? Chicago & N. W. Ry. Co. v. Nye Schneider Fowler Co., 260 U.S. 35 [43 S.Ct. 55, 67 L.Ed. 115]. During the fifty years of extensive judicial unfolding, the central ideas that inhere in this constitutional safeguard have become manifest. A careful study of the long line of cases especially dealing with the 'due process' clause, beginning with the Slaughter-House Cases, 16 Wall. 36 [21 L.Ed. 394], shows two dominant ideas conceived to be fundamental principles: (1) Freedom from arbitrary or wanton interference, and (2) protection against spoliation of property. 'Arbitrary,' 'wanton' and 'spoliation' are the words which are the motif of the decisions under the 'due process' clauses. That is as close as we can get to it; it is close enough

658

came to be decided in accordance with the philosophical views of a majority of the justices of the Supreme Court before whom the controversy was argued. The philosophy which stressed the property rights of the individual was incnned to see in the most socially desirable legislation a denial of due process, while the point of view which accorded first consideration to the good of the whole saw no unconstitutional deprivation of property in the most drastic and far reaching of enactments.[18] When personal liberties, rather than property rights, were involved the emphasis was shifted. Thus we find that while in recent years as the Supreme Court has increasingly recognized the right of a state in the exercise of its sovereign power incidentally to deprive individuals of their property, there has at the same time been definitely greater emphasis placed by the court upon the importance of the personal liberties secured to the individual by the Constitution and increased recognition of the place of the due process clause in protecting those liberties from impairment by the state. A realistic view of the changing interpretation of the due process clause compels the conclusion that whether applied to the exercise of the police power, the taxing power, the power of eminent domain or any other power inherent in sovereignty, the due process clause has been a potently restrictive force only when the numerical preponderance of justices of the Supreme Court has accorded the rights of the individual the prime consideration.

■■ It must, therefore, be concluded that, except for cases involving purely procedural due process, it is not facing reality to say that the want of due process of law is a question of fact. On the contrary, it is, as we have seen, a legal or, more accurately, a philosophical concept as to the extent to which the state, in the exercise of its sovereign power, should be permitted to deprive individuals within its jurisdiction of their lives, liberty or property.[19] Its application to the facts of a particular case is purely a matter of judgment and therefore is solely a question of law. The most, therefore, that the pleader is required to do in a case of the kind now before us is to set out those facts upon which he relies to prove a deprivation of life, liberty or property by the state and to aver that the deprivation was beyond that which,

when dealing with the great questions of government. What it means is that the Fourteenth Amendment intended to leave the States the free play necessary for effective dealing with the constant shift of governmental problems, and not to hamper the States except where it would be obvious to disinterested men that the action was arbitrary and wanton and therefore spoliative and unjustified."

[18] Compare the reasoning in Lochner v. New York, 1905, 198 U.S. 45, 25 S. Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133, with that in Bunting v. Oregon, 1917, 243 U.S. 426, 37 S.Ct. 435, 61 L.Ed. 830, Ann.Cas.1918A, 1043; Adkins v. Children's Hospital, 1933, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, with West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 57 S.Ct. 578, 81 L. Ed. 703, 108 A.L.R. 1330; New State Ice Co. v. Liebmann, 1932, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747, with Nebbia v. New York, 1934, 291 U.S. 502, 54 S. Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. See also Cushman-Social and Economic Interpretation, (1922) 20 Mich.L.Rev. 737.

[19] That "due process of law" is a philosophical concept of the character suggested rather than a factual one is highlighted by the recent five to four decision of the Supreme Court in three cases, one of which (Bowden v. City of Fort Smith) is indistinguishable from the case before us. In those cases (reported sub nom. Jones v. City of Opelika, 1942, 62 S.Ct. 1231, 86 L.Ed. — as in this, the City ordinances required all persons following certain specified businesses, trades or vocations to pay a fixed sum for the privilege. Members of the religious sect known as Jehovah's Witnesses sold books and pamphlets without making any payments and were arrested and convicted of violating the ordinances. They argued that the convictions were invalid because the ordinance as applied to them was unconstitutional since it deprived them of their freedom of speech, press and religion without due process of law. Five justices interpreted the ordinances as providing for the collection of a nondiscriminatory license fee and concluded that their enforcement against those selling books and other publications was a proper regulatory measure within the State's police power to which the liberties of the individual must yield. Four justices construed the ordinances as tax measures which when applied to the dissemination of ideas, educational and religious, became instruments to suppress or even destroy the free exercise of speech, press and religion and therefore violative of the due process clause of the Fourteenth Amendment.

under our Constitution, is allowable to the state in the exercise of its sovereign power, or, in the language of the Fifth and Fourteenth Amendments, that it was without due process of law.[20]

The plaintiffs' complaint in the present case meets this requirement. Shorn of all surplusage, the complaint alleges that the complainants sell books and pamphlets which embody their educational and religious ideas and that the defendants, acting under color of the city ordinance, seek to prevent them from thus disseminating their ideas unless they pay a tax levied upon the privilege. If the enforcement of such payments by the city in the exercise of the police or taxing powers of the state abridges the constitutional liberties of the complainants to a greater degree than the prevailing concept of due process permits, it is an unreasonable abridgement and therefore without due process of law and is in violation of the Fourteenth Amendment as a matter of law. As we have seen, the plaintiffs' complaint contains an allegation of such a violation. It follows from what has been said that the complaint sufficiently alleges a deprivation of liberty without due process of law. We accordingly hold that the district court had jurisdiction of the cause of action disclosed in the complaint. We may add that in this conclusion we are supported by the decision of the Circuit Court of Appeals for the Tenth Circuit in Oney v. Oklahoma City, 1941, 120 F.2d 861, and of the Circuit Court of Appeals for the First Circuit in City of Manchester v. Leiby, 1940, 117 F.2d 661, certiorari denied 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522.

We are thus brought to the merits of the case. In view of the fundamental importance of the question involved we think it not improper to say that Judge Biggs and the writer of this opinion in harmony with the views expressed by Chief Justice Stone and Justice Murphy and concurred in by Justices Black and Douglas in the case of Bowden v. City of Fort Smith, 62 S.Ct. 1231, 86 L.Ed. ——, decided June 8, 1942, would, if free to do so, vote to hold that the district court was right in concluding that the ordinance of the City of Jeannette is unconstitutional as applied to the activities of the plaintiffs and their associates.[21] The case before us is, however, indistinguishable from the case just cited and we are, therefore, constrained by the decision of the majority of the Supreme Court in that case to hold to the contrary.

Accordingly the decree of the district court is reversed and the cause is remanded with directions to dismiss the complaint.

JONES, Circuit Judge (dissenting).

As I read the bill of complaint, the plaintiffs fail to plead a case cognizable in a District Court. I should, therefore, reverse the decree below and remand with directions to the District Court to dismiss the complaint for want of jurisdiction.

That a District Court has jurisdiction under Sec. 24(14)[1] of the Judicial Code of a cause of action under R.S. § 1979[2] is, of course, not disputed. See Hague v. Committee for Ind. Org., 307 U.S. 496, 508, 529, 530, 59 S.Ct. 954, 83 L.Ed. 1423. The question here in limine is whether the bill of complaint alleges a cause within the jurisdiction conferred by Sec. 24(14). Plainly enough, it is not all state deprivation of liberty which the Fourteenth Amendment of the Constitution inhibits but only such as is effected without due process of law. Not liberty, but security against undue state deprivation thereof is the right which the Fourteenth Amendment secures in material regard. What R.S. § 1979 in turn confers is a right of action for the redress of the deprivation of a right secured by the Constitution and laws.

Certain it is that a District Court exercises only such jurisdiction as has been expressly conferred upon it by an Act of Congress. Kline v. Burke Construction

---

[20] In Columbus Ry., Power & L. Co. v. Columbus, 1918, 249 U.S. 399, 406, 39 S.Ct. 349, 351, 63 L.Ed. 669, 6 A.L.R. 1648, Justice Day said: "We are of opinion that there was jurisdiction in the District Court to entertain the bill as it presented questions arising under the Fourteenth Amendment to the federal Constitution not so wholly lacking in merit as to afford no basis of jurisdiction. Jurisdiction does not depend upon the decision of the case, and should be entertained if the bill presents questions of a character giving the party the right to invoke the judgment of a federal court."

[21] Judge Goodrich deems it inappropriate to express his individual views as to the merits of the case in view of the controlling decision of the Supreme Court in Bowden v. City of Fort Smith, supra.

[1] 28 U.S.C.A. § 41 (14).

[2] Act of April 20, 1871, c. 22, § 1, 17 Stat. 13, as modified and reenacted by R.S. § 1979, 8 U.S.C.A. § 43.

Company, 260 U.S. 226, 234, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077. Consequently, it is incumbent upon one who seeks the aid of a District Court to make out a case for jurisdiction. This should be made affirmatively to appear by the allegations of the bill. Mosher v. City of Phoenix, 287 U.S. 29, 30, 53 S.Ct. 67, 77 L.Ed. 148; Norton v. Larney, 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413; McCain v. Des Moines, 174 U.S. 168, 181, 19 S.Ct. 644, 43 L.Ed. 936. Unless that be done, jurisdiction must be deemed not to exist. Cf. Norton v. Larney, supra, 266 U.S. pages 515, 516, 45 S.Ct. 145, 69 L.Ed. 413. As the right to strike down state action through invocation of federal jurisdiction is a high privilege and one which necessarily involves the relation between the national and local governments, the specified requirements for a District Court's exercise of jurisdiction should no less be met in such instance. The plaintiffs should, therefore, be required to aver facts which show, or at least tend to show, what amounts to the state's denial of their liberty without due process of law before they may assert a right of action under R.S. § 1979 or invoke the court's jurisdiction under Sec. 24(14).

Substantially, all that the bill of complaint in this case avers is the plaintiffs' membership in the sect known as Jehovah's Witnesses, their canvassing and soliciting in the Borough of Jeannette for the distribution of books and pamphlets for a specified contribution without procuring a vendor's license as required by a borough ordinance, their arrest for violating the ordinance, hearings on the charges, convictions and appeals to the courts of the state. Not once throughout their lengthy bill of complaint do the plaintiffs aver a fact from which it can even be inferred, as a matter of law, that they were denied due process either substantively or procedurally. They make no assault upon the validity of the ordinance as being either arbitrary, discriminatory or capricious.[3] Specifically, the bill contains no averment that the ordinance, either upon its face or as administered, prohibited all canvassing or soliciting within the municipality. Cf. Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949. It is not even averred that the ordi-

nance was ever enforced with respect to more than house to house canvassing. There is no averment that the ordinance either creates or was utilized to create a discretionary censorship in anyone. Cf. Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155. Nor is there any averment that the ordinance, by its terms or as administered, discriminates against any group of applicants for licenses. In addition to this, there was open to the plaintiffs and they exercised, as the bill discloses, a right of appeal to courts of record in the state; and there is no suggestion that the plaintiffs were ever proceeded against for violating the ordinance except by means of legal process or that a hearing before a judicial tribunal on charges of violating the ordinance was ever denied them. Cf. Hague v. Committee for Ind. Org. supra. In one instance, they do refer to their hearings, in the Mayor's court as "mock" but do not hint at a fact to support the characterization.

Having thus failed to aver facts showing any want of due process, the plaintiffs contented themselves with a bald conclusion of law to the effect that the defendants' enforcement of the ordinance as to them deprived them of freedom of worship, speech and press "contrary to the Federal Constitution, Fourteenth Amendment, Section 1".[4] The majority say that this general allegation, taken in conjunction with the recitals as to enforcement of the ordinance and the plaintiffs' desire to distribute books and pamphlets without municipal license, is sufficient to spell out a case of unconstitutional state deprivation of liberty and hold in substance that the presence or absence of due process of law, where civil rights are said to be involved, depends upon the philosophical concept thereof on the part of the judges to whom the matter is addressed.

True enough, the term "due process of law" cannot, in the abstract, be defined with nicety or precision. It is also true that the very indefiniteness of the term renders it adaptable to changed conceptions which have received general acceptance. That views may change as human experiences widen and knowledge accumulates with the passing of time is but natural. And it is equally natural that such changes

---

[3] The ordinance, which was enacted in 1898, was of the familiar hawker or vendor type widely adopted and long used by municipalities.

[4] See paragraph 17 of the bill of complaint quoted in full in footnote 9 of the majority opinion, ante, p. 6.

should reflect themselves in the law when a word so relative as the word "due" is the subject for recurring interpretation in different circumstances. But that does not mean that there is never a present standard by which the dueness of legal process may be adjudged. The decided cases contemporaneously sketch out a pattern of its instant measure. It is at all times a shield against arbitrary, discriminatory or capricious legislative or other governmental action. By that standard, it was the duty of the plaintiffs to show by the allegations of their bill a case of the state's wrongful deprivation of their freedom of worship, speech or press. This they failed to do.

No case has been cited which appears to hold that, in order to invoke federal jurisdiction to restrain a state's alleged deprivation of life, liberty or property, all that is necessary is an allegation that the Fourteenth Amendment is being violated. Furthermore, the general language of decided cases is to be read in the light of what was actually before the courts. In Columbus Railway, Power & Light Company v. City of Columbus, 249 U.S. 399, 39 S.Ct. 349, 351, 63 L.Ed. 669, 6 A.L.R. 1648, cited by the majority, the bill of complaint which, as the Supreme Court said, "presented questions arising under the Fourteenth Amendment to the Federal Constitution not so wholly lacking in merit as to afford no basis of jurisdiction" was replete with detailed specifications of pecuniary loss to the complainant railway through the defendant municipality's insistence upon continued transit service under local franchise ordinances for inadequate and confiscatory rates of fare according to the facts averred in the bill. Of course, there was jurisdiction there. The bill showed, *prima facie*, a deprivation of property without due process of law.

As I read the opinion of Justice Stone in the Hague case, it seems implicit that a showing of a want of due process is essential to an invocation of the jurisdiction under Sec. 24(14) of an action under R.S. § 1979 for the redress of the deprivation of a right secured by the due process clause of the Fourteenth Amendment. The bill of complaint in the Hague case, whereby the jurisdiction was to be adjudged, fairly bristled with allegations of fact showing an arbitrary, discriminatory and even violent deprivation of the complainants' freedom of speech, press and assembly, all done by municipal officers of Jersey City under color of enforcing a city ordinance. Certainly, Justice Stone's opinion in the Hague case provides no implication that all that is necessary to jurisdiction under Sec. 24(14) to redress an alleged deprivation of liberty is an allegation that the defendants are acting contrary to the Fourteenth Amendment. If that were so, then the case involving a local ordinance or state statute that could not be taken directly to a District Court for attempted invalidation would, indeed, be difficult to imagine, for the security of the due process clause extends also to life and property. The necessary consequence would be an unwarranted extension of federal jurisdiction over local matters. Yet, a "serious apprehension for the rightful independence of local government" was a reason ascribed by Justice Stone for his dissent from the majority's extension of "privileges and immunities" in Colgate v. Harvey, 296 U.S. 404, 436, 445, 56 S.Ct. 252, 266, 80 L.Ed. 299, 102 A.L.R. 54, which, incidentally, was later expressly overruled in Madden v. Kentucky, 309 U.S. 83, 93, 60 S.Ct. 406, 84 L.Ed. 590, 125 A.L.R. 1383. A like apprehension suggests no less that, where an ordinance does not, on its face or as administered, deprive of life, liberty or property either arbitrarily, discriminatorily, or capriciously, and there has been no denial of procedural due process, the interpretation of the ordinance and the manner of its administration should, in the first instance, be left to the courts of the state.[5]

The opinion of Justice Roberts in the Hague case cannot be said to furnish the plaintiffs any support for federal jurisdiction under the averments of their bill. The right of action under R.S. § 1979, which Justice Roberts perceived under the bill in the Hague case, was for the redress of state abridgment of the complainants' privileges and immunities as citizens, contrary to the Fourteenth Amendment. What it is necessary to aver in order to plead jurisdiction of a case under the due process clause of the Fourteenth Amendment, was,

[5] Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 499, 500, 61 S.Ct. 643, 85 L.Ed. 971; Thompson v. Magnolia Co., 309 U.S. 478, 484, 60 S. Ct. 628, 84 L.Ed. 876; Lindsey v. Washington, 301 U.S. 397, 400, 57 S.Ct. 797, 81 L.Ed. 1182; Bevins v. Prindable, D. C.E.D.Ill., 39 F.Supp. 708, 713, a three judge court, where Jehovah's Witnesses assailed an Illinois statute as invalid under the Fourteenth Amendment.

therefore, neither germane nor considered. A want of due process is not a condition of the security against state abridgment which the Fourteenth Amendment gives to citizens in respect of their privileges and immunities. Moreover, even though the present plaintiffs are citizens, the redress which they seek is not for the abridgment of privileges or immunities attending their national citizenship. The rights which they assert are attributes of the liberty incident to all persons subject to the jurisdiction of the United States regardless of their citizenship.

In Minersville District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493, the matter of jurisdiction was not passed upon by the Supreme Court. The District Court had expressly found that jurisdiction of that case did not exist under Sec. 24(14) 28 U.S.C.A. § 41(14) but did exist under Sec. 24(1), 28 U.S.C.A. § 41(1). Gobitis v. Minersville School District, D.C.E.D.Pa., 21 F.Supp. 581, 586, 587. In so far as the security afforded by the due process clause of the Fourteenth Amendment was considered by the District Court in the Gobitis case, it was only to the extent of perceiving a right in the plaintiffs arising under the Constitution. It was upon that right and an amount in controversy in excess of $3,000, as found by the court, that jurisdiction of the Gobitis case was deliberately laid under Sec. 24(1); and the Court of Appeals affirmed without mentioning jurisdiction. Minersville School District v. Gobitis, 3 Cir., 108 F.2d 683. In these circumstances it is hard to see how the Gobitis case can be thought to imply that, where one invokes jurisdiction under Sec. 24(14) of a cause of action under R.S. § 1979 for alleged state deprivation of liberty, he is under no duty to aver facts showing that the deprivation resulted from a want of due process.

Neither the case of Oney v. Oklahoma City, 10 Cir., 120 F.2d 861, 866, nor the case of City of Manchester v. Leiby, 1 Cir., 117 F.2d 661, 664, certiorari denied 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522, seems to have been intended as a definitive ruling as to the scope of the pleading necessary to make out a case for jurisdiction under Sec. 24(14) of an action under R.S. § 1979. In the Oney case the District Court had dismissed for lack of jurisdiction, and the Court of Appeals, in reversing and remanding for further proceeding, did so in the expressed belief that the matter could "best be determined after issues have been made up and a full hearing had." Yet, it has been held (Mosher v. City of Phoenix, supra, 287 U.S. at page 30, 53 S.Ct. at page 67, 77 L.Ed. 148) that jurisdiction is not to be determined "by the way the facts turn out or by a decision of the merits." In the Leiby case the Court of Appeals held (page 664 of 117 F.2d) that "freedom of speech, of the press, and of religion are rights 'secured by the Constitution of the United States' within the meaning of Section 24(14); and that under Section 24(14) the District Court had jurisdiction of the * * * suit, which is of the sort described in the Civil Rights Act * * *." But that does not conclude what it is necessary for a plaintiff to aver in order to invoke the jurisdiction. As indicated at the outset of this opinion, there can be no doubt that jurisdiction under Sec. 24(14) is both appropriate and available for a right of action under R.S. § 1979 where a cause is shown to exist.

In no event should federal jurisdiction be assumed merely because of its supposed greater convenience for the determination of a constitutional question, as the learned court below apparently conceived (see reference to Reid v. Brookville, D.C.W.D.Pa., 39 F.Supp. 30, 32). Actual experience shows that the convenience of obtaining a final decision of a constitutional question is equally as great where the litigation is instituted in and proceeded with through the state courts. Except for the Hague case, the cases upon which the Supreme Court has passed in recent years (of a nature somewhat similar to the present) went there by appeal from final judgments of state courts.[6] While nothing

---

[6] Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031; Cox v. New Hampshire, 312 U. S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A. L.R. 1396; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Jones v. Opelika, Bowden v.

Fort Smith, and Jobin v. Arizona, 62 S. Ct. 1231, 86 L.Ed. ——, decided June 8, 1942. Valentine v. Chrestensen, 316 U. S. 52, 62 S.Ct. 920, 86 L.Ed. ——, which went to the Supreme Court on certiorari to the Court of Appeals for the Second Circuit, furnishes no exception. Jurisdiction in that case rested upon diversity of citizenship and the amount in controversy and not upon Sec. 24 (14) of the Judicial Code.

is to be deduced from that fact by way of an argument against the existence of jurisdiction in the District Courts, it at least indicates that proceeding through the state courts in local matters with ultimate appeal to the Supreme Court on any constitutional questions arising therein is both an expeditious and efficacious means for obtaining a final decision by the highest federal court. As the Supreme Court's jurisdiction in such regard exists by virtue of Sec. 237 of the Judicial Code, 28 U.S. C.A. § 344, it is unaffected by the limitations attending the jurisdiction of federal courts of first instance.

The conclusion herein reached with respect to the question of jurisdiction renders inappropriate a consideration of the merits. I, therefore, refrain from expressing any opinion as to the law relating thereto.